# EXHIBIT B

Trials@uspto.gov                                    Paper No. 48
Tel: 571-272-7822                              Entered: July 25, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

EBAY INC.,

Petitioner,

v.

MASTEROBJECTS, INC.,

Patent Owner.

_____

Case IPR2017-00740
Patent 8,539,024 B2

_____

Before KARL D. EASTHOM, ROBERT J. WEINSCHENK, and
CHRISTA P. ZADO, *Administrative Patent Judges*.

ZADO, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)*
*37 C.F.R. § 42.73*

IPR2017-00740
Patent 8,539,024 B2

# I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that eBay, Inc. ("Petitioner")[1] has not shown, by a preponderance of the evidence, that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of U.S. Patent No. 8,539,024 B2 (Ex. 1001, "the '024 patent") are unpatentable. *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

## A. Procedural History

Petitioner filed a Petition for *inter partes* review of claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of the '024 patent (Paper 2, "Petition" or "Pet."), and MasterObjects, Inc. ("Patent Owner")[2] subsequently filed a Preliminary Response (Paper 6, "Prelim. Resp."). In addition, Petitioner filed an authorized Reply to Patent Owner's Preliminary Response. Paper 7. On July 27, 2017, we instituted an *inter partes* review of all claims and all grounds presented in the Petition, namely claims 1–3, 6, 7, 9, 12, 15–17, 21, 24, 25, 32, 33, 35, and 36 of the '024 patent as unpatentable under 35 U.S.C. § 102(e) as anticipated by Kravets[3] and under 35 U.S.C. § 103(a) as obvious over Kravets, and claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of the '024 patent as unpatentable under 35 U.S.C. § 103(a) as obvious over the

---

[1] Petitioner identifies itself as the as real party in interest, pursuant to 37 C.F.R. § 42.8. Paper 2, 65.

[2] Patent Owner identifies itself as the as real party in interest, pursuant to 37 C.F.R. § 42.8. Paper 5, 2.

[3] U.S. Patent No. 6,704,727 B1 (Ex. 1003, "Kravets").

IPR2017-00740
Patent 8,539,024 B2

combination of Kravets and Bauer.[4]  Pet. 2; Paper 8, 39 ("Institution
Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Response.  Paper 15
("Response" or "PO Resp.").[5]  Petitioner thereafter filed a Reply to Patent
Owner's Response.  Paper 25 ("Reply").[6]

Patent Owner also filed a Conditional Motion to Amend [Claims]
Under 37 C.F.R. § 42.121, which proposes substitute claims 38 and 39 as
substitutes for claims 16 and 36, respectively, should we determine
claims 16 and 36 are unpatentable.  Paper 17 ("Motion to Amend" or
"Mot.").  Petitioner thereafter filed an Opposition to Patent Owner's Motion
to Amend.  Paper 27 ("Opposition" or "Opp.").  Patent Owner subsequently
filed a Reply to Petitioner's Opposition.  Paper 31 ("Reply to Petitioner's
Opposition" or "Reply to Opp.").

An oral hearing was held on May 2, 2018.  A transcript of the hearing
is included in the record.  Paper 47 ("Tr.").

---

[4] U.S. Patent No. 6,751,603 B1 (Ex. 1005, "Bauer").

[5] Patent Owner filed both a confidential (Paper 16) and non-confidential
(Paper 15) version of its Response.  This Final Written Decision need not,
and does not, rely on or cite to information designated as confidential.
Therefore, herein, we cite to the non-confidential version of Patent Owner's
Response.

[6] Petitioner filed both a confidential (Paper 26) and non-confidential
(Paper 25) version of its Reply.  This Final Written Decision need not, and
does not, rely on or cite to information designated as confidential.
Therefore, herein, we cite to the non-confidential version of Petitioner's
Reply to Patent Owner's Response.

IPR2017-00740
Patent 8,539,024 B2

*B. Additional Proceedings*

According to the parties, Patent Owner has asserted the '024 patent against Petitioner in *MasterObjects, Inc. v. eBay Inc.*, Case No. 4:16-cv-06824 (N.D. Cal.). Pet. 66; Paper 5, 2. Patent Owner also has asserted the '024 patent, in other district court proceedings that are no longer pending, against non-parties to this case. Pet. 66; Paper 5, 2–3. Also, Patent Owner has asserted patents related to the '024 patent in district court. Pet. 66.

*C. The '024 Patent*

The application leading to the '024 patent, Application No. 13/366,905 ("the '905 Application"), was filed on February 6, 2012. Ex. 1001, [21], [22]. The '905 Application is a continuation of Application No. 9/933,493, filed on August 20, 2001. *Id.* at [63]. Patent Owner does not assert an earlier priority date than the filing date of the '905 Application. Accordingly, for purposes of this Final Written Decision, the earliest priority date is August 20, 2001.

The '024 patent's specification (the "Specification") states that

the invention provides a session-based bi-directional multi-tier client-server asynchronous information database search and retrieval system for sending a character-by-character string of data to an intelligent server that can be configured to immediately analyze the lengthening string character-by-character and return to the client increasingly appropriate database information as the client sends the string.

Ex. 1001, 8:31–38.

According to the Specification, one advantage of early client-server systems was that data could be stored centrally, i.e., at the server, yet could be worked with locally, i.e., at the client. *Id.* at 2:5–17. The Specification states that early client-server systems had a problem, however, because

IPR2017-00740
Patent 8,539,024 B2

"changes to data on the server weren't updated immediately on the client."
*Id.* at 2:18–30.  As a result, the client could be manipulating data that is no
longer current.  *See id.*  The Specification also states that most client-server
systems using Internet protocols are "session-less," which has both
advantages and disadvantages.  *Id.* at 2:47–65.  An alleged disadvantage of
session-less connections is that "there is no totally reliable way for the server
to automatically update the client display once the server data change[s]."
*Id.* at 2:51–54.  Furthermore, in a session-less environment, the server only
checks the validity of input at the client after the client submits an entire
input form.  The Specification states that the invention "offers a highly
effective solution to the aforementioned disadvantages of both client-server
and Internet systems by providing a way to synchronize the data entered or
displayed on a client system with the data on the server system."  *Id.* at
5:66–6:3.  Furthermore, "[d]ata input by the client are immediately
transmitted to the server, at which time the server can immediately update
the client display."  *Id.* at 6:3–5.

The Specification discloses a purportedly improved client-server
system that facilitates an improved "sophisticated 'auto-completion' or 'type
ahead' function that is extremely useful when filling out forms."  *Id.* at 6:27–
30.  The Specification alleges that early client-server systems, unlike the
system of the invention, did not enable servers to generate auto-complete
suggestions as the user entered characters into an input string.  *Id.* at 6:45–
48.  Another alleged drawback of prior art systems was that the data used to
generate auto-complete suggestions was stored on a client, which limited the
flexibility, power and speed of the system.  *Id.* at 9:25–40.

5

IPR2017-00740
Patent 8,539,024 B2

Figure 1 of the Specification, reproduced below, illustrates a client-server system.



*FIG. 1*

Ex. 1001, Fig. 1. Figure 1 depicts clients 101, servers 103, and services 105. *Id.* Clients 101 "use a communication protocol 102 to send information, including but not limited to single characters, and to receive information, including but not limited to lists of strings and corresponding metadata." *Id.* at 12:51–55. "At least one Server 103 receives information from the Client and sends information to the Client." *Id.* at 12:55–56. Server 103 sends requests for information to Service 105, and Service 105 returns responses to Server 103, which may be returned to the client. *Id.* at 14:12–19. The communication protocol "is optimized for sending single characters

6

IPR2017-00740
Patent 8,539,024 B2

from a Client to the Server, and lists of strings from the Server to the Client." *Id.* at 11:58–61.

The Specification states that the disclosed "system is bi-directional and asynchronous, in that both the Client and the Server can initiate communications at any moment in time. The functionality of the system is such that it can run in parallel with the normal operation of clients." *Id.* at 12:24–27. The Specification describes an exemplary embodiment of the event flow associated with an auto-complete Service with reference to Figure 4. *Id.* at 18:18–20. When a user types the character "a" into a Questlet, i.e., a user interface element, a character event is generated to indicate the user's action. *Id.* at 10:60–62, 18:45–47. A client "Quester" sends a message to the client controller telling it to append the character "a" to the client Quester's input buffer. *Id.* at 18:48–49. The client controller then uses a protocol to synchronize the input buffer in the server Quester with the buffer in the client Quester. *Id.* at 18:53–55. The server controller may then look up query "a" in its Result Set cache, and if there is a previous Result Set in the cache, the Result Set is sent to the client without having to access the service. *Id.* at 18:55–63. When the user types a second character "b" into the Questlet, a corresponding event arrives at the server Quester, and the server Quester may, rather than search its Result Set cache, send an appropriate query message "ab" to the service. *Id.* at 18:64–19:2. The service executes the query and returns an appropriate Result Set for the "ab" query to the client. *Id.* at 19:2–7. The server Quester may be set up to auto-repeat query "ab" and continue to send updated Result Sets to the client. *Id.* at 19:13–14. When a user types a third character "c" into the Questlet, while character "c" is being sent to the server, a second and possibly third

IPR2017-00740
Patent 8,539,024 B2

Result Set from query "ab" query may still be on route to the client. *Id.* at 19:15–18. When the client controller determines that an incoming Result Set for query "ab" does not match the current input string "abc," the incoming Result Set is not forwarded to the Active Component, i.e., user interface, and therefore is not displayed to the user. *Id.* at 19:18–21. Also, the server Quester receives notice that character "c" has been appended to its input buffer, and the server Quester sends a new query "abc" to the service. *Id.* at 19:28–30. The server Quester then stops repeating execution of query "ab" and executes new query "abc." *Id.* at 19:30–33.

The Specification states that the client Quester "is intended to be multi-threaded, so that it can continue providing its services to its Active Component while it waits for results from the [] Server." *Id.* at 20:24–26. Results may be received not just from the most recent query, but also from an earlier query, "because the system is multi-threaded and multi-tier." *Id.* at 20:26–34. On the server side, separate execution threads are used for processing query requests, and processing and sending query results to the client. *Id.* at 20:61–21:21. Accordingly, these threads can execute in parallel.

### D. Challenged Claims

Of the challenged claims noted above, claims 1, 32, 35, 36, and 37 are independent. Claim 1, reproduced below, is illustrative:

1. A system comprising:

a server system, including one or more computers, which is configured to receive query messages from a client object, the server system asynchronously receiving and responding to the query messages from the client object over a network;

8

IPR2017-00740
Patent 8,539,024 B2

> the client object that, while a user is providing input comprising a lengthening string of characters, sends query messages to the server system;
>
> whereby the query messages represent the lengthening string as additional characters are being input by the user; and
>
> wherein the server system, while receiving said query messages, uses the input to query data available to the server system and send return messages to the client object containing results in response to the input; and
>
> wherein, upon receiving a return message of the return messages from the server system, the client object tests the usability of the results in the return message by checking that the return message corresponds to the latest query, and if usability is established, the client object displays or returns at least some result data to the user.

Ex. 1001, 31:52–32:7.

## II. DISCUSSION

### A. Level of Ordinary Skill in the Art

Factors that may be considered in determining the level of ordinary skill in the art include, but are not limited to, the types of problems encountered in the art, the sophistication of the technology, and educational level of active workers in the field. *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Petitioner's declarant, Richard N. Taylor, Ph.D., opines that a person of ordinary skill in the art in the field of the '024 patent

> would have been someone with a good working knowledge of data retrieval and at least one application level networking protocol. The person also would likely be familiar with Internet standards related to communications, programming languages, database systems, and a variety of client-server systems and technologies. The person would have gained this knowledge either through education (*e.g.*, a Bachelor of

9

> Science in Computer Science) and training, several years of
> practical working experience, or through a combination of
> these.

Ex. 1007 ¶ 48.

Patent Owner's declarant, George Edwards, Ph.D., concurs with Dr.
Taylor's "characterization of a person of ordinary skill in the art, and "would
add that the relevant field of study of the '024 Patent is software engineering
generally and distributed systems particularly." Ex. 2002,[7] ¶ 18.

We determine that the differences between the declarants' assertions
are immaterial to our analysis and that both assessments are consistent with
the '024 patent and the referenced prior art. For purposes of our
determination below, we adopt Dr. Taylor's description of the level of
ordinary skill in the art. However, our analysis would have been the same
had we adopted Dr. Edward's description.

### B. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are
interpreted according to their "broadest reasonable construction in light of
the specification of the patent" in which they appear. 37 C.F.R. § 42.100(b);
*see also Cuozzo Speed Techs., LLC, v. Lee*, 136 S. Ct. 2131, 2141–46
(2016). We interpret claim terms using "the broadest reasonable meaning of
the words in their ordinary usage as they would be understood by one of
ordinary skill in the art, taking into account whatever enlightenment by way

---

[7] Patent Owner filed both a confidential and non-confidential version of
Exhibit 2002. This Decision need not, and does not, rely on or cite to
information designated as confidential. Therefore, herein, we cite to the
version of Exhibit 2002 filed as non-confidential.

IPR2017-00740
Patent 8,539,024 B2

of definitions or otherwise that may be afforded by the written description contained in the applicant's specification." *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997). "Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016). We apply these standards, and we determine no claim terms require express construction. *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs. v. Am. Sci. Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

*C. Principles of Law*

To prevail in its challenges to the patentability of the claims, Petitioner must prove its propositions of unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

Under 35 U.S.C. § 102, "[a] claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). Also,

> Section 103 forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103).

IPR2017-00740
Patent 8,539,024 B2

### D. Unpatentability In View of Kravets

Petitioner asserts that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24, 25, 32, 33, 35, and 36 of the '024 patent are unpatentable under 35 U.S.C. § 102(e) as anticipated by Kravets.  Pet. 2, 15–55; Reply 1–21.  Petitioner relies on declarations of Dr. Taylor to support its contentions.  Exs. 1007, 1028, 1031. In our Decision on Institution, we also instituted *inter partes* review on grounds that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24, 25, 32, 33, 35, and 36 of the '024 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Kravets.  *Id.* at 38–39.  Patent Owner disputes Petitioner's contentions, arguing that Kravets discloses neither the "asynchronous" claim limitations nor the claimed "usability test."  PO Resp. 9–24, 31–46.  Patent Owner relies on declarations of Dr. Edwards to support its contentions.  Exs. 2002, 2004, 2014.  We have reviewed the full record from trial, and we determine that Petitioner has not shown by a preponderance of the evidence that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24, 25, 32, 33, 35, and 36 of the '024 patent are unpatentable as anticipated by Kravets or as obvious over Kravets.

### 1. Overview of Kravets (Ex. 1003)

Petitioner asserts Kravets is prior art under 35 U.S.C. § 102(e). Pet. 15.  Patent Owner does not dispute Petitioner's assertion that Kravets is prior art.  Kravets issued from a patent application filed January 31, 2000. Ex. 1003, [22].  Based on the earliest possible priority date of the '024 patent (*see supra* Section I.C), for purposes of this Final Written Decision, we conclude that Kravets is prior art to the '024 patent under 35 U.S.C. § 102(e).

Kravets discloses a method and system for providing a set of search terms in response to a user input.  Ex. 1003, Abstract.  Figure 1 of Kravets,

IPR2017-00740
Patent 8,539,024 B2

reproduced below, depicts the disclosed system.



*Id.* at Fig. 1.  Figure 1 depicts client 20, client cache 22, website server 30,
predictive search server 40 ("PSS"), PSS cache 42, database 50, and event
system 70.  *Id.* at Fig. 1, 3:10–5:54.  With respect to Figure 2, Kravets
discloses an exemplary method in which a user utilizes a web browser
operating on client 20 to search for information available on the World Wide
Web.  *Id.* at 5:56–59.  Figures 3 through 11 provide additional detail
regarding the method depicted in Figure 2.

IPR2017-00740
Patent 8,539,024 B2

*Fig. 2*



*Id.* at Fig. 2.  Represented in Figure 2, at step 110 a user inputs a character string on a keyboard, preferably comprising three alphanumeric characters, but the string can consist of any number of characters.  *Id.* at 5:66–6:3. When the user enters the input string, client 20 generates and transmits a request to website server 30, which forwards the request to PSS 40.  *Id.* at 6:10–12, 6:15–16.  The request includes the input string and requests a response from PSS 40.  *Id.* at 6:13–14.  At step 120, after PSS 40 receives the request, PSS 40 uses the input string to identify a first set of search terms

14

IPR2017-00740
Patent 8,539,024 B2

from a master set of search terms maintained by PSS 40. *Id.* at 4:16–17, 5: 63–65, 6:20–24; *see id.* Figs. 3, 4. The first set of search terms may be stored in PSS 40's cache memory 42. *Id.* at 6:26–28. Alternatively, the first set of search terms can be transmitted to client 20 and stored in client 20's cache memory 22. *Id.* at 6:34–37. The second alternative is referred to as aggressive read ahead caching because it may limit the amount of information that must be transmitted from PSS 40 to client 20 in response to subsequent requests. *Id.* at 6:40–44. In step 130, PSS 40 selects a second set, i.e., a subset, of search terms from the first set of search terms based on value scores assigned to each search term in the first set of search terms. *Id.* at 7:27–32; *see id.* Fig. 5. In step 140, PSS 40 transmits to client 20 a precomputed HTML/JavaScript for each search term in the second set of search terms so that the second set of search terms may be displayed at the client to the user. *Id.* at 7:42–46. In an alternative embodiment, the precomputed HTML/JavaScript for the second set of search terms need not be transmitted to client 20 because it is already in client 20's cache memory 22 as a result of aggressive read ahead caching. *Id.* at 7:46–50. "The second set of search terms can be displayed to the user in nearly real time while the user is providing the input. For example, the second set of search terms can be displayed to the user before the user finishes typing all of the characters of the search term." *Id.* at 7:50–55.

Kravets discloses that the method of Figure 2 can be repeated if the user provides additional characters as input. *Id.* at 8:13–14. If a user provides an additional, fourth character, a revised set of search terms can be identified from the first set of search terms "as described herein." *Id.* at 8:14–26. The method described "herein" refers to the method of Figure 2,

IPR2017-00740
Patent 8,539,024 B2

and therefore, the first set of search terms is stored either in client 20's cache memory 22 or PSS 40's cache memory 42. *Id.* at 6:26–28, 6:34–37. Alternatively, a revised set of search terms can be identified from the master set of search terms "as described herein." *Id.* at 8:18–21. The method described "herein" refers to Figure 2, and therefore, the master set of search terms is stored in PSS 40's cache memory 42. *Id.* at 4:16–17.

Pursuant to 37 C.F.R. 1.52(e), Kravets also incorporates by reference Appendices A and B (Ex. 1004), which comprise exemplary client (Appendix A) and server (Appendix B) source code. *Id.* at 1:14–25; *see also* Ex. 1007 ¶ 99.

## 2. *Discussion*

With regard to the challenges in view of Kravets alone, each of the challenged independent claims of the '024 patent, claims 1, 32, 35, and 36, recites a usability test. Ex. 1001, 32:2–5 (claim 1, "the client object tests the usability of the results in the return message by checking that the return message corresponds to the latest query"), 34:37–39 (claim 32, "the client object tests the usability of each return message by checking that the return message corresponds to the latest query"), 34:63–65 (claim 35, "the client object checks the usability of the results of the one of the return messages using a more recent version of the input"), 35:19–23 (claim 36, "the client object tests the usability of the results in the return message by comparing the return message to the then-current input or matching it with a request identification maintained on the client object").

For reasons discussed below, we find that Petitioner has not shown sufficiently that Kravets discloses or teaches the claimed usability test. Accordingly, we determine Petitioner has not demonstrated by a

IPR2017-00740
Patent 8,539,024 B2

preponderance of the evidence that the challenged claims are unpatentable as anticipated by Kravets or that the challenged claims are unpatentable as obvious over Kravets. Because the issue concerning the usability test is dispositive with regard to these grounds, we do not reach the parties' evidence and arguments regarding the remaining limitations of the challenged claims.

For claim 1's recitation of a "server system" Petitioner relies on Kravets' website server 30 and predictive search server ("PSS") 40. Pet. 17–19. For claim 1's recitation of a "client object" Petitioner relies on Kravets' client 20. *Id.*

Claim 1 recites that the client object "while a user is providing input comprising a lengthening string of characters, sends query messages to the server system." Ex. 1001, 31:58–60. Petitioner relies on Kravets' disclosure of a user entering a three character input string at client 20, and while the user enters a fourth character to the input string at client 20, client 20 sending a request (which Petitioner alleges is a "query message") to web server 30, which is subsequently forwarded to PSS 40, containing the three character input string. Pet. 20–22 (citing Ex. 1003, 8:37–40, 5:63–6:3, 6:8–16, 8:13–25). Kravets incorporates by reference an appendix containing exemplary JavaScript code that Petitioner argues is an implementation of Kravets' technique of sending requests while a user enters additional characters to an input string. *Id.* at 22 (citing Ex. 1007 ¶¶ 108, 151); *see also* Ex. 1004 (Appendices A and B of Kravets, which comprise JavaScript code). Petitioner relies on Dr. Taylor's testimony that the JavaScript code's change() function composes and sends a request to PSS 40 if there are at least three significant characters of search text in the search box. *Id.* (citing

17

IPR2017-00740
Patent 8,539,024 B2

Ex. 1003, Fig. 2; Ex. 1007 ¶¶ 108, 151); *see* Ex. 1007 ¶¶ 143–149.

According to Dr. Taylor, the change() function is called anytime the text in

Kravets' search box changes, including when a user lengthens the text string

by inputting an additional character.  Ex. 1007 ¶ 108.  Because the change()

function is called and sends a request to PSS 40 when a user enters an

additional character in the search box, Petitioner argues Kravets discloses

sending a query message to a server system while a user is providing input

comprising a lengthening string of characters.  Pet. 20–22.

Claim 1 further recites that the server system "while receiving said

query messages, uses the input query data available to the server system and

send[s] return messages to the client object containing results in response to

the input."  Ex. 1001, 64–67.  Petitioner relies on Kravets' disclosure of

PSS 40 receiving a request containing an input string and using the input

string to identify responsive matching terms to return to client 20 for

potential display to the user as suggestions.  Pet. 23–24 (citing Ex. 1003,

4:35–48).  Petitioner contends the matching terms returned to client 20 are in

response to a corresponding input string.  *Id.* at 24.

Claim 1 requires that the return messages be tested by the client object

for usability: "the client object tests the usability of the results in the return

message by checking that the return message corresponds to the latest

query."  Ex. 1001, 32:1–5.  Petitioner does not provide sufficient contentions

that Kravets discloses this limitation, either expressly or inherently.  Pet. 25–

29.  In particular, even though Petitioner states that Kravets discloses this

limitation, Petitioner does not provide sufficient arguments that Kravets

discloses checking that a return message corresponds to the latest query.

Petitioner instead argues Kravets teaches this feature by virtue of its

18

IPR2017-00740
Patent 8,539,024 B2

description of displaying appropriate terms to a user. *Id.* at 25. For reasons explained further below, we find Kravets does not disclose the feature or render it obvious.

With respect to the term "return message," Petitioner argues this "could reasonably be interpreted as one or more data packets, or a portion of those data packets containing result data." Pet. 25. For disclosure of this claim term, Petitioner relies on Kravets' disclosure of a response that is sent from PSS 40 to client 20 and includes a second set of search terms (comprising 6 terms in one embodiment). *Id.* at 27–28. For the term "query," Petitioner argues this term "may be nothing more than a character string." *Id.* at 25–26. Petitioner relies on the current input string in Kravets' search box, also referred to as current prefix by Petitioner, for disclosure of "the latest query." *Id* at 26. Accordingly, under Petitioner's arguments, Petitioner must show Kravets discloses or teaches checking that the response sent from PSS 40 to client 20 corresponds to the current input string in the search box.

Petitioner relies on Kravets' disclosure that when a user enters an additional, fourth, character to the input string in the search box, a request for suggestions is sent to PSS 40. PSS 40 identifies a first set of search terms (whose first four characters match the four-character input string) from a master set, and selects a subset of the first set which is sent to client 20 as a response to the request. *Id.* at 26 (citing Ex. 1003, 8:12–24, Fig. 6, block 300; Ex. 1007 ¶¶ 160–162). "[A] subset of appropriate terms (*e.g.* five or six suggestions) are then displayed to the user." *Id.* (citing Ex. 1003, 8:20–24, Fig. 6 (block 300); Ex. 1007 ¶¶ 160–162).

The disclosed technique in Kravets for determining which terms to

IPR2017-00740
Patent 8,539,024 B2

display to the user includes 1) PSS 40 identifying a first set of search terms, which preferably comprises 500 search terms, where the first $n$ characters of each search term matches the $n$-character input string in the request (Ex. 1003, 6:17–36); and 2) PSS 40 selecting a second set of search terms, such as 6 terms, from the first set of search terms by selecting the 6 terms that have the highest value scores (Ex. 1003, 7:26–40). This disclosure does not describe a client object testing for usability by checking that a return message corresponds to the latest query.

First, this disclosure relates to actions performed by the server, rather than the client. *Id.* at 6:17–36, 7:26–40 (describing PSS 40 performing this technique). But claim 1 requires the client object perform the test for usability. Ex. 1001, 32:2–3 ("the *client object* tests the usability of the results in the return message") (emphasis added).

Next, with regard to identifying a first set of search terms based on finding terms whose first $n$ characters match the $n$-character input string in a specific request received by PSS 40, Kravets does not describe checking to see whether the $n$-character input string in the specific request corresponds the current input string (which may have changed since the sending of the specific request) in the search box.

With regard to selecting a second set of search terms, Petitioner does not present evidence or argument that selection in Kravets of a subset of terms (for example, 6 terms) from the first set of terms (preferably 500 terms) based on value scores has anything to do with checking that the first set of search terms corresponds to the current input string in the search text box.

Accordingly, the technique described in Kravets for determining

IPR2017-00740
Patent 8,539,024 B2

which search terms to display neither discloses nor teaches the claimed
usability test.

As an attempt to show Kravets discloses the usability test, Petitioner
provides an exemplary scenario it argues would have occurred in a system
implementing the JavaScript in Kravets' Appendix A to arrive at the display
illustrated in Figure 6 of Kravets. Pet. 26–27. Figure 6 of Kravets is
reproduced below.



Fig. 6

Ex. 1003. Figure 6 depicts a search engine input screen with a search box in
which a user enters an input string. *Id.* at 7:55–58, Fig. 6. The search box
comprises the character string "Toile." A second set of search terms 300,
i.e., a subset of the first set of search terms selected based on value scores
(*id.* at 7:26–40), is displayed to the user in the search engine input screen.

IPR2017-00740
Patent 8,539,024 B2

*Id.* at 7:58–61, Fig. 6.  Each search term 300 displayed to the user begins
with the string "toile," i.e., the current string in the search box.  *Id.* Fig. 6.

Petitioner argues that a skilled artisan would have understood Kravets
teaches the following scenario depicted in the table below to arrive at the
arrangement shown in Figure 6.

| Time | Event |
|------|-------|
| $T_1$ | User types the three characters "toi" |
| $T_2$ | Client sends query for "toi" to server ($Q_1$) |
| $T_3$ | Server sends suggestion results for "toi" to client |
| $T_4$ | Client receives suggestion results for "toi" ($R_1$) |
| $T_5$ | Client trims 1st set of result to smaller 2nd set |
| $T_6$ | Client displays up to 5 results for "toi" to user |
| $T_7$ | User types a character "l" |
| $T_8$ | Client sends query for "toil" to server ($Q_2$) |
| $T_9$ | Server obtains revised set of results |
| $T_{10}$ | Server send revised results for "toil" to client |
| $T_{11}$ | Client receives suggestion results for "toil" ($R_2$) |
| $T_{12}$ | Client trims revised set of results for "toil" |
| $T_{13}$ | Client displays up to 5 results for "toil" to user. |
| Tx | Repeat $T_7$-$T_{13}$ for "toile" to arrive at Fig. 6, block 300 |

Pet  27 (citing Ex. 1007 ¶¶ 164–166).  This table, which appears in the
Petition, depicts what Petitioner asserts is the timing of events leading to the
display shown in Figure 6 of Kravets.  In this scenario, Petitioner contends
suggestion results for a particular input string, e.g., the input string "toi,"
received by a client from a server at time $T_4$, are returned in a "return
message," $R_1$.  *Id.* at 27–28.  Petitioner further contends that the results for
the input string "toil," e.g., the input string resulting from a user adding the

22

IPR2017-00740
Patent 8,539,024 B2

character "l" to the input string "toi," results in the client receiving a revised
set of suggestion results from the server at time $T_{11}$, and therefore results in a
second "return message," $R_2$. *Id.* Petitioner argues that the test for usability
takes place at steps occurring at times $T_6$ and $T_{12}$ because the JavaScript in
Kravets' Appendix A "teaches that the list of [suggestion results] is
compared against the current input string, discarding entries that do not
match the current input string." *Id.* at 29 (citing Ex. 1007 ¶¶ 112–122, 171).
Petitioner contends it is the client that performs this comparison. *Id.* at 27
(e.g., "Client trims revised set of results for 'toil'").

In support of the argument that Kravets' JavaScript teaches the client
performing a usability test at times $T_6$ and $T_{12}$, Petitioner relies on portions
of Dr. Taylor's declaration that describe the following program functions:
setCache() and scrollCache(). Ex. 1007 ¶¶ 112–122. Dr. Taylor opines that
setCache() executes when a response is received from a PSS, and, if the
response is received within a specified time, executes the function
scrollCache(). *Id.* ¶ 112. According to Dr. Taylor, scrollCache() "builds the
list of candidates that will be displayed to the user" by "cycl[ing] through the
list of candidates in the cache." *Id.* ¶ 115. Dr. Taylor states that "all entries
that do not begin with the current prefix as well as those which are shorter
than the prefix" will be skipped. *Id.* If there are 5 or more suggestions, then
the 5 results with the highest value scores are selected for display, according
to Dr. Taylor. *Id.* ¶ 119.

Patent Owner does not dispute Petitioner's argument that Kravets
discloses scrolling through the client cache and skipping search terms that do
not correspond to the current input string in the search box. PO Resp. 20;
Tr. 45:1–22. Patent Owner disputes, however, that Kravets uses the same

IPR2017-00740
Patent 8,539,024 B2

technique as recited in claim 1.  PO Resp. 21–22 (the claim limitation
"do[es] not merely require a usability test to be performed, but also
specif[ies] *how* that test must be performed" and "A client object that . . .
does the test in a different way . . . would not fall within the scope of
claim 1"); Tr. 45:1–22.

Patent Owner argues that the local cache that is scanned in Kravets
includes results from several queries.  PO Resp. 23 ("The cached results may
include results contained in numerous previously received server
messages.").  According to Patent Owner, scanning a cache that includes
multiple results from multiple queries is not tantamount to checking that a
particular return message corresponds to the latest query.  *Id.* at 23–24.

We agree with Patent Owner that Petitioner has not shown Kravets
discloses, teaches, or renders obvious, the technique recited in claim 1 for
testing usability.  Claim 1 specifies that the client object tests usability "by
checking that the *return message* corresponds to the latest query."  Ex. 1001,
32:2–5 (emphasis added).  Petitioner has not shown that Kravtes checks that
what Petitioner contends are return messages, messages $R_1$ or $R_2$, correspond
to the current input string in the search box.  Rather, according to Petitioner,
the function scrollCache() is called when the client receives a return message
to determine which terms to display to the user.  Petitioner has shown at best
that the system in Kravets teaches checking that individual entries in the
client cache correspond to the latest query, but not that a return message
corresponds to the latest query.  For example, a call to scrollCache() upon
receipt of return message $R_2$, under Dr. Taylor's analysis of how the system
in Kravets works, would have resulted in cycling through the client cache
and skipping search terms that do not begin with the string "toil" (the latest

24

query).  However, Patent Owner argues, and Petitioner does not disagree,
that the search terms in the cache includes results from both return messages
$R_1$ and $R_2$.  PO Resp. 23; *see also* Tr. 23:16–24:5 (Petitioner's counsel
agreeing that scroll cache does not limit its search to data in the HTML
payload, which Petitioner contends is the return message, but also searches
the cache for data from previous payloads (e.g., what Petitioner contends are
previous return messages)).  Petitioner provides no evidence or argument
that the system in Kravets distinguishes between cache entries returned with
message $R_1$ from those returned with message $R_2$.  We find that cycling
through a cache, which includes search terms from multiple return messages,
where there is no indication which message each search terms belongs to,
fails to disclose or teach checking for correspondence between a *return
message* and the latest query.

Our finding is consistent with the disclosure of the '024 patent.  One
embodiment of the '024 patent, in connection with Figure 6, describes this
claimed feature.  A Client Quester waits for and receives an event (step 604).
*Id.* at 19:63.  If the event is a character event, i.e., a user has entered a
character to add to an input string, an input buffer is updated accordingly
(step 607).  *Id.* at 20:2–3.  The client-side cache is checked to determine
whether results for the updated input buffer is present, and may therefore be
retrieved from, the client-side cache.  *Id.* at 20:7–11.  If corresponding
results are not present in the client-side cache, a new query is executed and
sent to the Server Quester by the Client Quester (step 611).  *Id.* at 20:11–14.
The Client Quester "is intended to be multi-threaded," so that it can continue
to send new queries upon additional character events (e.g., when additional
characters are added to the input string) while it waits for results from the

25

IPR2017-00740
Patent 8,539,024 B2

Server Quester for previous queries. *See id.* at 20:24–26. Because new queries may be sent before results from previous queries have returned, results may no longer correspond to the most recent query, and therefore might not be usable. A Result Retriever waits for results from the Server Quester (step 613), and checks whether received results are usable (step 615) by determining whether the results correspond to the latest query. *Id.* at 20:30–32. Even if results do not correspond to the latest query, they may still be usable if the Client Quester can filter the results to match to the latest input buffer. *Id.* at 20:34–36. The disclosure regarding Figure 6 does not provide details regarding how the Result Retriever determines whether results correspond to the latest query. However, the disclosure accompanying Figure 8 of the '024 patent describes an embodiment of the alleged invention that describes a technique for making such a determination by associating an identifier with each query, wherein the identifier is copied into the corresponding result. *Id.* at 21:30–31. In pertinent part, the '024 patent discloses

> [e]very time a Client Quester . . . send[s] something new to the Server Quester that may result in a new QuestObjects Result Set, it includes a request identifier. This identifier is then copied in the resultSetId when the QuestObjects Result Set is sent to the Client Quester. In this way Client Questers know which request the QuestObjects Result Set belongs to. (This is important because the system is asynchronous and on occasions it may occur that a newer QuestObjects Result Set is sent to the client before an older one. The request identifier and QuestObjects Result Set identifier allow the Client Quester to detect and handle this.).

*Id.* at 23:30–41. During the hearing, Patent Owner acknowledged that this disclosure describes testing the usability of the results in the return message by checking that the return message corresponds to the latest query.

26

IPR2017-00740
Patent 8,539,024 B2

Tr. 52:9–25.  Claim 36 of the '024 patent suggests another technique for determining usability by comparing the return message to "the then current input" string.  Ex. 1001, 35:19–21.  In both instances, the *return message* is compared or checked.  Claims 1 and 36 even distinguish between the results contained in the return message and the return message itself.  *Id.* at 32:2–5 (claim 1, "the client object tests the usability of the results in the return message by checking that the return message corresponds to the latest query"), 35:19–22 (claim 36, "the client object tests the usability of the results in the return message by comparing the return message to the then-current input or matching it with a request identification").

    We find that, consistent with the '024 patent disclosure, the plain language of claim 1 requires checking that the *return message* corresponds to the latest query.  It is insufficient to check suggestion results in the cache, where there is no indication which return message each suggestion in the cache is associated with.  Such checks do not amount to checking that a particular *return message* corresponds to a particular input string.

    Independent claim 32 recites a similar usability test to that of claim 1, namely "the client object tests the usability of each return message by checking that the return messages corresponds to the latest query." Ex. 1001, 34:37–39.  Petitioner notes that claim 32 requires checking more than one return message, because it recites testing the usability of "of each return message." Pet. 47.  Petitioner argues Kravets teaches this limitation because Kravets teaches sending at least two query messages.  *Id.*  However, for reasons discussed above, Petitioner does not show checking that *the return message* corresponds to the latest query.

    Independent claim 36 similarly requires comparing the return message

IPR2017-00740
Patent 8,539,024 B2

to a then current-input string or matching it with a request identification. Ex. 1001, 35:19–23 ("the client object tests the usability of the results in the return message by comparing the results in the return message by comparing the return message to the then-current input or matching it with a request identification"). For reasons discussed above, Petitioner has not shown comparing or matching a *return message*.

Independent claim 35 recites "upon receiving one of the return messages . . . the client object checks the usability of the results of the one of the return messages using a more recent version of the input." *Id.* at 34:62–65. Petitioner has not shown scrolling terms in a cache is tantamount to checking the usability of the results of one of the return messages where, as in Kravets, there is no indication which return message each scrolled cache entry belongs to. Petitioner also does not provide a sufficient reason, if any, for modifying Kravets to reach the claimed invention.

With respect to dependent claims 2, 3, 6, 7, 9, 12, 15–17, 21, 24, 25, and 33 of the '024 patent, Petitioner does not provide additional argument or evidence regarding the usability test.

Upon review of the record in this proceeding, we determine that Petitioner has not demonstrated by a preponderance of the evidence that any one of claims 1–3, 6, 7, 9, 12, 15–17, 21, 24, 25, 32, 33, 35, and 36 of the '024 patent is unpatentable under § 102(e) as anticipated by Kravets or unpatentable under § 103(a) as obvious over Kravets.

### E. Unpatentability Over the Combination of Kravets and Bauer

Petitioner asserts that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of the '024 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kravets and Bauer. Pet. 55–65; Reply 21–

28

26. Petitioner relies on declarations of Dr. Taylor to support its contentions. Exs. 1007, 1028, 1031. Patent Owner disputes Petitioner's contentions. PO Resp. 47–60. Patent Owner relies on declarations of Dr. Edwards to support its contentions. Exs. 2002, 2014. We have reviewed the full record from trial, and we determine that Petitioner has not shown by a preponderance of the evidence that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of the '024 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kravets and Bauer.

Of the challenged claims against which Kravets and Bauer are asserted, claims 1, 32, 35, 36, and 37 are independent. With regard to the usability test recited in independent claims 1, 32, 35, and 36, Petitioner does not provide additional arguments and evidence that the claimed test would have been obvious over the combination of Kravets and Bauer. Accordingly, for reasons we discussed above, Petitioner has not made a sufficient showing with regard to the usability test limitation recited in these claims. *See supra* Sec. II.D.2.

Independent claim 37 also recites a usability test: "the client object tests the usability of the results in the return message by matching an ID associated with the input sent to the server system with an ID maintained in the client object." Ex. 1001, 36:18–21. For this limitation, Petitioner argues Kravets teaches that PSS 40 has the ability to identify the user who entered the input string. Pet. 64–65. In support of this argument, Petitioner relies on Kravets' disclosure that in alternative embodiments two factors used by PSS 40 in calculating a value score may include psychographic and demographic profiles of the user. *Id.* at 65 (citing Ex. 1003, 5:20–41; Ex. 1007 ¶¶ 294–295). Kravets discloses "[t]he demographic profile

IPR2017-00740
Patent 8,539,024 B2

preferably represents certain characteristics or features of a user" and "[t]he psychographic profile preferably represents certain preferences or tendencies of a user." Ex. 1003, 5:34–38. Even if we were to accept Petitioner's argument that Kravets teaches the ability of *PSS 40* to identify a user associated with a particular request, Petitioner has not articulated how Kravets teaches including an identifier in a return message that would allow *client 20* to identify a user associated with the input sent to PSS 40, as required by claim 37 which recites "the client object tests the usability . . . by matching an ID." Ex. 1001, 36:18–21.

Petitioner also argues "[c]hecking an identifier to provide continuity and/or security was notoriously well known prior to 1999," relying on Dr. Taylor's unsupported conclusion in which he copies verbatim the statement in the Petition. Pet. 65 (citing Ex. 1007 ¶ 296). Dr. Taylor cites to an earlier paragraph of his declaration, but this, too, fails to cite any evidence or explain why checking an identifier was notoriously well known prior to 1999. Ex. 1007 ¶ 296 (citing *id.* at ¶ 273). The paragraph to which Dr. Taylor refers states that client-side caching is an exemplary technique for reducing data transmission, which may be useful in low bandwidth or high latency networks. Ex. 1007 ¶ 273. There is no discussion of checking an identifier to provide continuity or security, or for any reason. *Id.*

Petitioner also argues a skilled artisan would have been motivated to implement an identifier "that allows the system to match request/response pairs to improve system security and reliability." Pet. 65 (citing Ex. 1011, 15–16). Petitioner does not adequately explain why a skilled artisan would have been motivated to do so. Petitioner cites a two-page excerpt of a textbook titled, "Security for Computer Networks," but does not explain the

relevance of the textbook to the field of the invention, or why a skilled artisan would have considered the textbook and applied its teachings to the combination of Kravets and Bauer. Petitioner does not even identify any particular disclosure or teaching in the two-page excerpt. We find Petitioner has not provided sufficient argument and evidence with regard to its motivation argument.

For the foregoing reasons, Petitioner's evidence and argument regarding the usability test with regard to independent claim 37 is insufficient.

With respect to dependent claims 2, 3, 6, 7, 9, 12, 15–17, 21, 24–26, 33, and 34 of the '024 patent, Petitioner does not provide additional argument or evidence regarding the usability test.

Upon review of the record in this proceeding, we determine that Petitioner has not demonstrated by a preponderance of the evidence that any one of claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of the '024 patent is unpatentable under § 103(a) as obvious over the combination of Kravets and Bauer.

## F. Patent Owner's Contingent Motion to Amend

Patent Owner requests, should claims 16 and 36 be determined to be unpatentable, that the '024 patent be amended to include proposed substitute claims 38 and 39, respectively. Mot. 1. Having determined Petitioner has not shown claims 16 and 36 are unpatentable, we need not address Patent Owner's contingent Motion to Amend. Accordingly, we dismiss Patent Owner's Motion to Amend as moot.

IPR2017-00740
Patent 8,539,024 B2

### G. Motions to Exclude

#### 1. Petitioner's Motion

Petitioner filed a Motion to Exclude (Paper 40), Patent Owner filed an opposition thereto (Paper 43), and Petitioner filed a reply (Paper 45). Petitioner seeks to exclude Exhibits 2002, 2004, paragraphs 4, 7, 12, and 14 of Exhibit 2006, and Exhibits 2010, 2014, 2015 and 2016. Paper 40, 1.

Exhibit 2006 is the declaration of Mark H. Smit, a named inventor of the '024 patent, filed by Patent Owner in support of Patent Owner's Response. Mr. Smit's declaration regards secondary indicia of nonobviousness, which we need not, and do not, address in this Final Written Decision regarding the unpatentability of the challenged claims.

Exhibit 2010 appears to be a publication, and is written in German. Petitioner alleges, and Patent Owner does not dispute, that no English translation of this document has been provided to Petitioner or entered in this proceeding. Paper 40, 5; Paper 43, 2–3. In any event, this exhibit relates to arguments we need not, and do not, address in this Final Written Decision regarding the unpatentability of the challenged claims.

Exhibits 2015 and 2016 are online references that include a definition for the term "primary key," a term that we need not, and do not address in this Final Written Decision regarding the unpatentability of the challenged claims.

As we discussed above, Exhibits 2006, 2010, 2015, and 2016 relate to arguments we need not, and do not, address regarding the unpatentability of the challenged claims. Because we do not rely on or reference these exhibits in our Final Written Decision, we dismiss as moot Petitioner's request to exclude these exhibits.

IPR2017-00740
Patent 8,539,024 B2

Exhibits 2002, 2004, and 2014 are declarations of Patent Owner's expert, Dr. Edwards. Petitioner argues we should exclude Dr. Edwards' declarations on grounds that his testimony is unreliable and more prejudicial than probative. Paper 40, 7–8. Petitioner argues Dr. Edwards is not qualified to testify regarding the level of ordinary skill in the art as of the date of alleged invention, August 20, 2001, because Dr. Edwards was not himself a person of ordinary skill in the art in 2001. *Id.* at 8–9. Dr. Edwards did not complete high school until 2000, according to Petitioner, and therefore could not have had a bachelor of science and the requisite years of experience by 2001 to be a person of ordinary skill in the art at that time. *Id.* Dr. Edwards states in his first declaration that he did not receive his Bachelor of Science degree until 2003. *Id.* at 9 (citing Ex. 2002 ¶ 3). Dr. Edwards also confirmed during his deposition that as of the alleged invention date, he had only worked part-time in the relevant field for approximately 15 hours per week. *Id.* at 10 (citing Ex. 1030, 24:2–6).

Patent Owner responds that Dr. Edwards' level of experience as of the date of invention goes toward the weight to be given to his testimony, rather than to its admissibility. Paper 43, 4. Patent Owner also responds that personal knowledge is not a requirement for providing expert testimony under Federal Rule of Evidence 702 and 703. *Id.* at 4 (citing Fed. R. Evid. 602). As such, according to Patent Owner, Dr. Edwards need not have been a person of ordinary skill in the art at the time of alleged invention in order to provide testimony regarding the level of ordinary skill at the time. *Id.*

We agree with Patent Owner that Rules 702 and 703 do not require an expert declarant to have been a person of ordinary skill in the art at the time

IPR2017-00740
Patent 8,539,024 B2

of alleged invention in order to opine regarding the level of ordinary skill at the time.  In determining the level of ordinary skill, an expert may rely on art available at the time, and may consider the types of problems encountered in the art, the sophistication of the technology, and educational level of active workers in the field.  *See In re GPAC, Inc.*, 57 F.3d at 1579.  An expert is not required to rely on personal knowledge.  Petitioner's arguments regarding Dr. Edwards' level of experience as of the alleged invention date may be relevant to determining the amount of weight to be accorded to Dr. Edwards' testimony, but do not warrant its exclusion.

Petitioner also argues that a number of Dr. Edwards' statements are conclusory, and unsupported by evidence.  Petitioner argues that such testimony should be excluded because it is more prejudicial than probative.  Paper 40, 11–13.  Petitioner's grievance goes to the weight to be accorded Dr. Edwards' testimony.  The Board is capable of ascertaining the weight to be accorded to unsupported declarant testimony.

Exhibit 2014 is Dr. Edwards' declaration regarding proposed substitute claims 38 and 39 presented in Patent Owner's Motion to Amend, which Petitioner separately argues should not be admitted.  *Id.* at 13–15.  Because we find Petitioner has not demonstrated unpatentability of the challenged claims, we need not, and do not consider proposed substitute claims 38 and 39.  Accordingly, we dismiss as moot Petitioner's request to exclude Dr. Edwards' testimony regarding these substitute claims.

Accordingly, we deny Petitioner's request to exclude Exhibits 2002, 2004, and 2014.

For the foregoing reasons, Petitioner's Motion to Exclude is denied-in-part, and dismissed-in-part.

IPR2017-00740
Patent 8,539,024 B2

### 2. *Patent Owner's Motion*

Patent Owner filed a Motion to Exclude Evidence (Paper 38), Petitioner filed an opposition thereto (Paper 42), and Patent Owner filed a reply (Paper 44). Patent Owner seeks to exclude Exhibits 1031, 1035, 1036, 1037, 1040, and 1041. Paper 38, 1.

Exhibit 1031 is a declaration of Dr. Taylor. Paragraphs 22–26 of this exhibit relate to the claimed usability test. Ex. 1031 ¶¶ 22–26. We discussed the usability test above in determining Petitioner has not shown unpatentability of the challenged claims. *See supra* Sec. II.D.2. The remainder of Exhibit 1031 relates to matters we need not, and do not, address in this Final Written Decision. With regard to paragraphs 22–26 of Exhibit 1031, Patent Owner does not provide any specific arguments concerning why we should exclude this testimony. Petitioner broadly asserts Dr. Taylor's opinions lack sufficient basis, and specifically identifies paragraphs 4–8, 11, and 27, none of which relate to the usability test. Paper 38, 1–3. Patent Owner does not set forth specific reasons why we should exclude paragraphs 22–26. Accordingly, with regard to paragraphs 22–26, we deny Patent Owner's request to exclude Exhibit 1031, and we dismiss as moot Patent Owner's request regarding the remainder of this exhibit.

Exhibits 1035, 1036, 1037, 1040, and 1041, relate to arguments we need not, and do not, address in this Final Written Decision. Because we do not rely on these exhibits, we dismiss as moot Patent Owner's request to exclude Exhibits 1035, 1036, 1037, 1040, and 1041.

For the foregoing reasons, Petitioner's Motion to Exclude is denied-in-part, and dismissed-in-part.

IPR2017-00740
Patent 8,539,024 B2

## III. SUMMARY

For the foregoing reasons, we determine that Petitioner has not demonstrated, by a preponderance of the evidence, that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24, 25, 32, 33, 35, and 36 of the '024 patent are unpatentable under 35 U.S.C. § 102(e) as anticipated by Kravets or under 35 U.S.C. § 103(a) as obvious over Kravets, or that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of the '024 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kravets and Bauer.

## IV. ORDER

Accordingly, it is

ORDERED that claims 1–3, 6, 7, 9, 12, 15–17, 21, 24–26, and 32–37 of the '024 patent have not been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude (Paper 40) is denied-in-part and dismissed-in-part as moot;

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 38) is denied-in-part and dismissed-in-part as moot; and

FURTHER ORDERED that, because this Decision is final, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R § 90.2.

IPR2017-00740
Patent 8,539,024 B2

PETITIONER:

Todd Siegel
todd.siegel@klarquist.com

Richard McLeod
law@rickmcleod.com

John Lunsford
john.lunsford@klarquist.com

PATENT OWNER:

John Ferrell
jsferrell@carrferrell.com

James Nachtwey
jnachtwey@carrferrell.com